IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Consolidated Civil Action

RALEIGH WAKE CITIZENS
ASSOCIATION, et al.,                    )
                                        )
                                        )
                    Plaintiffs,         )
                                        )
          v.                            )          No. 5:15-CV-156-D
                                        )
WAKE COUNTY BOARD OF ELECTIONS,         )
                                        )
                    Defendant.          )


CALLA WRIGHT, et al.,                   )
                                        )
                    Plaintiffs,         )
                                        )
          v.                            )          No. 5:13-CV-607-D
                                        )
STATE OF NORTH CAROLINA,                )
                                        )
                    Defendant.          )

## ORDER

In both cases in this consolidated action, plaintiffs move for attorneys' fees and litigation

expenses under 42 U.S.C. § 1988, expert fees under 52 U.S.C. § 10310(e), and costs under Federal

Rule of Civil Procedure 54(d) and 28 U.S.C. § 1920. See [D.E. 118, 119] (No. 5:15-CV-156-D);

[D.E. 125, 126] (No. 5:13-CV-607-D).[1] Defendant Wake County Board of Elections ("defendant")

has responded in opposition [D.E. 123], and plaintiffs have replied [D.E. 124]. As explained below,

the court grants plaintiffs' motions in part and denies them in part.

---

[1] Because the motions, responses, and replies are identical in both cases, the court considers
them together. Unless otherwise indicated, all subsequent citations to docket entries refer to Case
No. 5:15-CV-156-D.

Plaintiffs challenged the North Carolina General Assembly's ("General Assembly") 2013 redistricting plan for electing the non-partisan Wake County School Board and the General Assembly's 2015 redistricting plan for electing the partisan Wake County Board of Commissioners. The redistricting plan for the Wake County School Board is contained in Session Law 2013-110. The redistricting plan for the Wake County Board of Commissioners is contained in Session Law 2015-4 and is identical to the plan in Session Law 2013-110. See Tr. Ex. 438 (S.L. 2013-110, § 5); Tr. Ex. 439 (S.L. 2015-4, § 1.(c)–.(d)). The court has discussed the intricacies of these plans, [D.E. 104] 5–6, and summarizes the essence of the litigation sufficiently to resolve the pending motions.

In these actions, plaintiffs contended that the redistricting plans in Session Law 2013-110 and Session Law 2015-4 (collectively, "Session Laws") violate the one-person, one-vote principle in the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article I, § 19 of the North Carolina Constitution. As for the School Board redistricting plan, plaintiffs contended that the plan resulted from the General Assembly's partisan desire (1) to disadvantage incumbents on the non-partisan Wake County Board of Education ("Wake County Board of Education" or "Wake County School Board") who are registered Democrats who support "progressive" education policies and (2) to favor suburban and rural voters over urban voters. As for the Board of Commissioners redistricting plan, plaintiffs contended that the plan resulted from the General Assembly's partisan desire (1) to favor suburban and rural voters over urban voters and (2) to favor voters who favor Republican candidates over voters who favor Democratic candidates on the Wake County Board of Commissioners. Plaintiffs also contended that the 2015 General Assembly racially gerrymandered District 4 in the Board of Commissioners redistricting plan and thereby violated the Equal Protection Clause of the Fourteenth Amendment of the United States

Constitution.

On March 17, 2014, United States District Judge Terrence W. Boyle dismissed the challenge to the School Board redistricting plan for lack of subject-matter jurisdiction and for failure to state a claim. See [D.E. 38] 9 (No. 5:13-CV-607-D). Plaintiffs appealed, and on May 27, 2015, the United States Court of Appeals for the Fourth Circuit affirmed in part, reversed in part, and remanded the case. See Wright v. North Carolina, 787 F.3d 256 (4th Cir. 2015). The court upheld dismissal of the State of North Carolina and several proposed state officials under the Eleventh Amendment, but held that plaintiffs adequately pleaded that Session Law 2013-110 violated the one-person, one-vote principle. See id.

In July 2015, both cases were reassigned to the undersigned. See [D.E. 27] (No. 5:15-CV-156-D); [D.E. 49] (No. 5:13-CV-607-D). The court thereafter consolidated the cases. See [D.E. 36] (No. 5:15-CV-156-D); [D.E. 53] (No. 5:13-CV-607-D).

On December 16–18, 2015, the court held a bench trial in this consolidated action. On February 26, 2016, the court found that plaintiffs had not proven their case, entered judgment for the Wake County Board of Elections, and declined to enjoin the Wake County Board of Elections from administering elections under the challenged redistricting plans. See [D.E. 64, 65]. Plaintiffs appealed. See [D.E. 66].

On July 1, 2016—after the Supreme Court's intervening decision in Harris v. Arizona Independent Redistricting Commission, 136 S. Ct. 1301 (2016)—the Fourth Circuit, in a 2-1 decision, resolved the appeal in this case. The Fourth Circuit unanimously rejected plaintiffs' racial gerrymandering claim. See Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections, 827 F.3d 333, 352–53 (4th Cir. 2016). As for plaintiffs' one-person, one-vote claim, the Fourth Circuit applied Harris and found that this case was the "rare[ ]" and "unusual" case referenced in Harris.

3

Id. at 351. Accordingly, the Fourth Circuit held that the plans violated the one-person, one-vote principle in the United States Constitution and the North Carolina Constitution. Id. at 351–52. The Fourth Circuit remanded "with instructions to enter immediately judgment for Plaintiffs, granting both declaratory relief and a permanent injunction, as to the one person, one vote claims." Id. at 353–54 (footnote omitted). The Fourth Circuit added that it saw "no reason why the November 2016 elections should proceed under the unconstitutional plans we strike down today." Id. at 354 n.13.

Rather than issue its mandate immediately, the Fourth Circuit scheduled the mandate to issue on July 22, 2016. See [D.E. 104] 9. In anticipation of that date and in order to facilitate prompt remedial proceedings so that the November 2016 elections could take place as scheduled, this court issued an order on July 8, 2016, requesting certain information from the parties, the legislative leaders of the General Assembly, and the North Carolina State Board of Elections. See [D.E. 78]. Specifically, this court asked the parties and the legislative leaders to address the mandate rule, the principles governing any court-ordered remedial plan, and a schedule for devising, considering, and adopting any court-ordered remedial plan. See id. at 8.

On July 14, 2016, the Wake County Board of Elections petitioned for rehearing en banc. On that same date, the Fourth Circuit stayed the mandate pending a ruling on the petition.

In plaintiffs' response to the court's July 8, 2016 order requesting views concerning a remedy, plaintiffs contended that once the mandate issues, the court should enjoin the use of the statutes. See [D.E. 82] 2. Plaintiffs also contended that once the mandate issues, "unless and until the North Carolina General Assembly enacts other redistricting plans or methods of election, the State Board of Elections and the . . . Wake County Board of Elections[] are legally obligated to enforce the election system previously in place." Id.

On July 26, 2016, the Fourth Circuit denied the petition for rehearing en banc. On July 27,

2016, this court notified the parties, the North Carolina State Board of Elections, and the legislative leaders that this court would hold a status conference on August 2, 2016, to discuss the remedy. See [D.E. 86]. On August 2, 2016, this court held a status conference. On August 3, 2016, the mandate issued. See [D.E. 89].

On August 4, 2016, in accordance with the Fourth Circuit's mandate, the court declared that the population deviations in the redistricting plans in Session Law 2013-110 and Session Law 2015-4 violate the one-person, one-vote-principle in the equal protection clauses of the Fourteenth Amendment and Article I, § 19 of the North Carolina Constitution. See [D.E. 93].

On August 9, 2016, this court issued its remedial order. Cf. Raleigh Wake Citizens Ass'n, 827 F.3d at 354 n.13. The court's remedial order enjoined the use of the population deviations in the BOE and BOCC districts in the Session Laws. See [D.E. 104] 6. The court did not declare any other provisions of the Session Laws to be unconstitutional.

The court's remedial order imposed a court-ordered interim election plan for 2016, but did not reinstate the entire 2011 redistricting plan and election scheme that preceded the Session Laws, despite plaintiffs' insistence to the contrary. See [D.E. 104] 36–37. The court's remedial order used the districts from the 2011 plan, but included an overall interim system of election for 2016 that largely tracked the policy decisions reflected in the Session Laws. See id.

The court's remedial order prohibited use of the population deviations and imposed a temporary, court-ordered redistricting plan that was far more limited than the relief plaintiffs sought. Plaintiffs sought an injunction that declared the Session Laws unconstitutional in their entirety and reverted to the method of election for the BOE and BOCC under the 2011 plan. See [D.E. 1] 22 (the "Wright Compl."); [D.E. 22] 17 (the "RWCA Compl."). Plaintiffs also sought a declaration that, if the General Assembly failed to promulgate a lawful election method, the BOE and the BOCC each

5

had the authority to adopt its own redistricting plan. See Wright Compl. at 22; RWCA Compl. at 17.

After the Fourth Circuit's decision in July 2016, plaintiffs argued that merely enjoining the population deviations did not provide them the full scope of their requested relief. Plaintiffs repeatedly insisted that they were entitled to relief enjoining the Session Laws in their entirety. See [D.E. 82] 5, 20; [D.E. 87] 2; [D.E. 96] 3. Plaintiffs also sought relief that reinstated the entire election system contained within the 2011 redistricting plan—including the type of districts, length of terms, and timing of elections. Plaintiffs consistently argued that the court lacked authority to implement a court-ordered election plan for 2016 and could instead only give effect to the 2011 plan by operation of law because, according to plaintiffs, that was the last legally enforceable plan. See [D.E. 82] 7–8; [D.E. 96] 5–6.

This court rejected the scope of injunctive relief plaintiffs sought. The court also rejected plaintiffs' arguments that the Fourth Circuit invalidated the Session Laws in their entirety and that the provisions of the Session Laws were not severable. [D.E. 104] 23–27. The court also rejected plaintiffs' arguments that the court lacked the authority to impose an interim election plan for 2016 and that the court was required to give effect to the 2011 plan and electoral scheme. Id. at 18–23. Rather, the court held that the Session Laws rendered the 2011 plan a "legal nullity" and that "[w]hen the Fourth Circuit invalidated the redistricting plan in Session Law 2013-110 and Session Law 2015-4 in Raleigh Wake Citizens Association, it did not state or intimate that it was reviving the 2011 plans and electoral scheme." Id. at 19. The court also rejected plaintiffs' request that any plan for 2016—including a court-ordered remedial plan—reflect the election scheme contained in the 2011 plan. The court also declined plaintiffs' demand to (1) delay the election of the 2013 BOE seats until 2017, (2) impose four-year terms for those seats, (3) impose three-year terms for BOE

6

seats up for election in 2016—returning the BOE to 5-4 staggered terms and odd-year elections in contravention of the Session Laws, and (4) have four-year terms for BOCC districts 4, 5, and 6, which were up for election in 2016.

Instead, the court followed many of the policy judgments in the Session Laws, including holding elections for all BOE members in 2016 (avoiding staggered terms), imposing even-numbered terms (avoiding odd-year elections), and keeping the two-year terms for BOCC districts 4, 5, and 6 to "comport[] with the expectations of those candidates who filed to run in 2016." [D.E. 104] 35–37. The court departed from the Session Laws and shortened the term of election for BOE members in 2016 from four years to two years.

During the remedial phase, plaintiffs filed an emergency petition for a writ of mandamus and suggested that the Fourth Circuit remand the case to another United States District Judge in the district. See Pet. Writ Mandamus, In re: Raleigh Wake Citizens Ass'n, et al., No. 16-1898, [D.E. 3] (Aug. 8, 2016). Plaintiffs filed their original petition the day before the court entered its remedial order and then amended the petition in response to the remedial order. See Am. Pet. Writ Mandamus, In re: Raleigh Wake Citizens Ass'n, et al., No. 16-1898, [D.E. 8] (Aug. 9, 2016). Plaintiffs argued that enjoining the population deviations was not enough. See Pet. Writ Mandamus, In re: Raleigh Wake Citizens Ass'n, et al., No. 16-1898, [D.E. 3-1] 12 (Aug. 8, 2016). Rather, plaintiffs sought "complete relief . . . including relief from the clearly 'pretextual' fruits of the unconstitutional tree." Id.

Plaintiffs repeated their arguments that this court lacked the "power or authority to order any remedial districts," id. at 17, and that "the trial court should have ordered a remedy reverting back to [the 2011] plan in its entirety without any changes." Am. Pet. Writ Mandamus, In re: Raleigh Wake Citizens Ass'n, et al., No. 16-1898, [D.E. 8-1] 6 (Aug. 9, 2016). Plaintiffs also argued that

the court-imposed interim election plan for 2016 "significantly differs" from the election system under the 2011 plan because it imposes different term lengths for the BOE and BOCC seats, allows for non-staggered terms, allows all BOE and BOCC seats to be vacant in 2018, and has no method of election in place after 2016. Id. at 4. Plaintiffs called staggered terms "an important feature," argued that having all of the BOE and BOCC seats up for election in 2018 "directly conflicts with the prior constitutional election methods," and declared that "[a]ll of these problems should be avoided." Id. at 4–5. Plaintiffs argued that the "only remedy" was to enjoin the Session Laws in their entirety and that the emergency petition was "necessary to assure a proper implementation of [the Fourth Circuit's] prior rulings." Id. at 6. On August 10, 2016, before defendant responded, the Fourth Circuit summarily dismissed plaintiffs' petition for a writ of mandamus.

## II.

Plaintiffs are prevailing parties and request $681,373.95 in attorneys' fees. The court has discretion whether to award a reasonable attorneys' fee to a prevailing party under 42 U.S.C. § 1988. See 42 U.S.C. § 1988(b). A prevailing plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (quotation omitted).

Defendant argues that special circumstances warrant denying a fee award. See [D.E. 123] 8–13. The special-circumstances exception, however, is "narrow[]" and applies only on "rare" occasions. Lefemine v. Wideman, 758 F.3d 551, 555–56 (4th Cir. 2014). Having considered the entire record, the court declines to apply the special-circumstances exception. See id. at 555–59.

Awarding a reasonable attorneys' fee involves a three-step process. See McAfee v. Boczar, 738 F.3d 81, 88 (4th Cir. 2013), as amended (Jan. 23, 2014). First, the court calculates the lodestar amount (reasonable hourly rate multiplied by hours reasonably expended). Id. In making the

8

lodestar determination, the court "appl[ies] the Johnson/Barber factors." Grissom v. The Mills Corp., 549 F.3d 313, 320 (4th Cir. 2008) (citing Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717–19 (5th Cir. 1974), and Barber v. Kimbrell's, Inc., 577 F.2d 216, 226 (4th Cir. 1978)). The Johnson/Barber factors are:

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Id. at 321 (quotation omitted). Second, the court must then subtract fees for time spent on any unsuccessful claims unrelated to successful claims. See id. Finally, the court "awards some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff."

Id.

At the third step, a foundational link must exist between the degree of success and the amount of an attorneys' fee award:

The touchstone of an attorney's fee award "is the degree of success obtained." See Farrar v. Hobby, 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992) (quotation omitted); Hensley, 461 U.S. at 436. Although strict proportionality between attorney's fees and the amount of plaintiff's recovered damages is not required, see Yohay v. City of Alexandria Employees Credit Union, Inc., 827 F.2d 967, 974 (4th Cir. 1987), the court is to award "some percentage of the [requested attorney's fees], depending on the degree of success enjoyed by the plaintiff." See City of Aiken, 278 F.3d at 337.

O'Fay v. Sessoms & Rogers, P.A., No. 5:08-CV-615-D, 2010 U.S. Dist. LEXIS 80128, at *8–9 (E.D.N.C. Aug. 9, 2010) (unpublished); see Farrar v. Hobby, 506 U.S. 103, 114 (1992); Hensley, 461 U.S. at 436; McAfee, 738 F.3d at 88.

9

Defendant asks the court to reduce the requested fee award because the requested hourly rates and the hours expended are not reasonable. Defendant also asks the court to exclude the time plaintiffs spent on the unsuccessful racial gerrymandering claim and litigation concerning the legislative leaders. Finally, defendant asks the court to reduce the fees requested to account for plaintiffs' failure to obtain the expansive relief they sought.

A.

First, the court must calculate the lodestar amount. This inquiry focuses on two things: (1) the reasonable hourly rate for the work performed and (2) whether the hours expended were reasonable.

1.

"[T]he burden rests with the fee applicant to establish the reasonableness of a requested rate" by "produc[ing] satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." Grissom, 549 F.3d at 321 (quotation omitted). To determine the reasonableness of the hourly rate claimed the court looks to "the prevailing market rates in the relevant community," McAfee, 738 F.3d at 91 (citation and quotation omitted), for similar work performed by attorneys of "reasonably comparable skill, experience, and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984); see McAfee, 738 F.3d at 91. "The community in which the court sits is the first place to look to in evaluating the prevailing market rate." Grissom, 549 F.3d at 321 (alteration and quotation omitted); see Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 179 (4th Cir. 1994).

Plaintiffs seek hourly rates of $550 per hour for Ms. Earls, $400 for Ms. Riggs, $225 per hour for contracted analysts, $200 per hour for unlicensed legal fellows, and $150 per hour for unlicensed legal interns/externs. See [D.E. 119-1] ¶ 29. Plaintiffs support their proposed rates by citing to

10

declarations of three attorneys who practice or have practiced election law. Essentially, these declarations assert that the hourly rates of Ms. Earls and Ms. Riggs are reasonable. See [D.E. 119-3] ¶¶ 6–7; [D.E. 119-4] ¶¶ 19–23; [D.E. 119-5] ¶ 7.

The court has reviewed the declarations and finds that they fail to provide "satisfactory specific evidence" of local market rates for the attorneys and non-attorneys in this case. See Grissom, 549 F.3d at 321. Thus, the court declines to adopt the proposed rates.

To support the proposed rates, plaintiffs also cite the litigation experience of Ms. Earls and Ms. Riggs and the "specialized expertise" of two staff attorneys billed at $250 and $300 per hour. [D.E. 120] 16–17. Ms. Earls and Ms. Riggs are excellent lawyers and are well versed in election and constitutional law. Nonetheless, their rates contrast sharply both with the local rates charged by the excellent counsel for defendant in this action and with the rates of other local counsel that have represented defendant in cases involving constitutional issues. See Warren Decl. [D.E. 123-1] ¶¶ 8, 11. Defendant's lead counsel's hourly rate of $360 per hour was less than the hourly rates of both Ms. Earls and Ms. Riggs, and defendant's second chair counsel—who conducted several witness examinations at trial (including an expert witness)—billed at $210 per hour, almost $200 less than Ms. Riggs and only $10 more than unlicensed attorneys for plaintiffs who did not appear as counsel of record. See id. ¶ 8.

Having reviewed the record, the court finds that plaintiffs have not met their burden of establishing the reasonableness of the requested rates. Instead, the court finds the following rates to be reasonable:

- Ms. Earls: $450 per hour (reduced from $550);
- Ms. Riggs: $280 per hour (reduced from $400);
- Staff attorneys: $210 per hour (reduced from $300 and $250);
- Legal fellows: $150 per hour (reduced from $250 and $200);
- Policy analysts: $175 per hour (reduced from $225).

See McAfee, 738 F.3d at 91; Grissom, 549 F.3d at 321–23. The court declines to award plaintiffs fees for the work billed to legal externs and interns because plaintiffs have not established the reasonableness of charging fees in the local market for the work of legal externs and interns. See McAfee, 738 F.3d at 91; Grissom, 549 F.3d at 321–23.

2.

The next step in calculating the lodestar entails examining the reasonableness of the hours expended. In doing so, the court can "exclude from a fee request hours that are excessive, redundant or otherwise unnecessary" because "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." Daly v. Hill, 790 F.2d 1071, 1079 (4th Cir. 1986) (alteration and quotation omitted). Trial courts also "may take into account their overall sense of a suit, and may use estimates in calculating and allocating attorney's time." Fox v. Vice, 563 U.S. 826, 838 (2011).

Plaintiffs conducted minimal discovery and had significant experience in election law. Nonetheless, plaintiffs seek compensation for almost 1,400 billable hours and argue that these actions required an "above-average outlay of hours" because plaintiffs had to "amass[] a large volume of documentary evidence and witness testimony on decades of electoral history" and conduct an extensive review of "redistricting data, documents, and case law." [D.E. 120] 12. Plaintiffs' counsel also devoted a substantial amount of time to communicating with their clients and other interested parties, drafting and receiving emails, and conducting intra-office meetings.

The court has reviewed the time sheets that plaintiffs provided. See [D.E. 119-1] 39–80. The records reveal hours that "are excessive, redundant or otherwise unnecessary." Daly, 790 F.2d at 1079. Moreover, plaintiffs have failed to prove how "the many hours of client conferences may have aided [counsel's] preparation of the case." Id. Thus, the court reduces the hours expended, and

12

calculates the lodestar, as follows:

| | Hours Sought | Deduction | Revised Hours | Revised Rate | Sum |
|---|---|---|---|---|---|
| Earls | 659.45 ([D.E. 119-1] ¶ 30) | 25.2 | 634.25 | $450 | $285,412.50 |
| Riggs | 455.13 (id. ¶ 34) | 16.76 | 438.37 | $280 | $122,743.60 |
| Eppsteiner | 110.3 (id. ¶ 38) | 15.3 | 95 | $210 | $19,950 |
| Seawell (post-bar) | 145.74 (id. ¶ 42) | 19.54 | 126.2 | $210 | $26,502 |
| Seawell (pre-bar) | 193.87 (id. ¶ 46) | 0 | 193.87 | $150 | $29,080.50 |
| Collins | 21.75 (id.) | 3 | 18.75 | $150 | $2,812.50 |
| Maffetore | 44.3 (id.) | 44.3 | 0 | $0 | $0.00 |
| Heaney | 2.175 (id.) | 0 | 2.175 | $150 | $326.25 |
| McBride | 108.2 (id. ¶ 47) | 0 | 108.2 | $175 | $18,935.00 |
| Ketchie | 90.25 (id.) | 0 | 90.25 | $175 | $15,793.75 |

Revised total:    $521,556.10

In reaching this figure, the court has considered the Johnson/Barber factors relevant to this case, including the time and labor expended, the difficulty of the questions raised, the customary fee for like work, the skill required to properly perform the legal services rendered, and the experience, reputation, and ability of the attorneys. The court also has considered its familiarity with the claims and record in this case. See Fox, 563 U.S. at 838; McAfee, 738 F.3d at 88–91; Grissom, 549 F.3d at 323–24.

B.

Once the initial lodestar amount is calculated, the court should make two separate reductions. First, the court should "subtract fees for hours spent on unsuccessful claims unrelated to successful ones." O'Fay, 2010 U.S. Dist. LEXIS 80128, at *5–6. Second, after subtracting the fees for hours spent on unsuccessful claims, the court "awards some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." Id.; see Grissom, 549 F.3d at 320–21; Johnson v. City of Aiken, 278 F.3d 333, 337 (4th Cir. 2002). In adjusting the lodestar calculation

13

to account both for unsuccessful claims and for the degree of relief obtained on the successful

claims, the court keeps in mind that

> [i]n many cases, much of counsel's time will be devoted generally to the litigation
> as a whole, making it difficult to divide the hours expended on a claim-by-claim
> basis. In such a case, the district court focuses on the significance of the overall relief
> obtained by the plaintiff in relation to the hours reasonably expended on the
> litigation. In any event, the most critical factor in determining a fee award is the
> degree of success obtained. The court, in awarding attorney's fees, has discretion to
> attempt to identify specific hours that should be eliminated, or it may simply reduce
> the award to account for the limited success.

O'Fay, 2010 U.S. Dist. LEXIS 80128, at *6 (citations and quotations omitted).

1.

The court subtracts for time spent on the unsuccessful racial gerrymandering claim and

motion practice concerning adding the legislative leaders as defendants. See Hensley, 461 U.S. at

436–37. Although plaintiffs argue that they accounted for the unsuccessful racial gerrymandering

claim by subtracting 10% of their hours billed to this matter since drafting the RWCA complaint,

[D.E. 120] 14,[2] this reduction fails to sufficiently account for the substantial amount of time spent

on this unsuccessful claim.

At trial, plaintiffs called several witnesses (both lay and expert) concerning their racial

gerrymandering claim. Of the thirteen lay witnesses, six testified on direct examination about the

relationship between race and the districts, including but not limited to whether African-American

voters were able to elect the candidate of their choice. This testimony included the testimony of

Senator Blue, Reverend Johnson, Commissioner West, Representative Gill, Janet Barnes, and

Commissioner Burns. Plaintiffs' two expert witnesses also presented data and opinions concerning

---

[2] This 10% deduction already factored into plaintiffs' request for $681,373.95 in attorneys'
fees by including a reduction for the hours billed.

14

the racial gerrymandering claim.

Although plaintiffs only made the racial gerrymandering claim in the RWCA case, the court consolidated the case for trial. There was a single presentation of evidence for all claims in both cases during a single non-bifurcated proceeding. Essentially, the two claims in the consolidated case were a one-person, one-vote claim and a racial gerrymandering claim. Because there were no depositions or any motion practice concerning the claims in this case, the trial transcript fairly represents the proportional time spent on presenting evidence regarding each claim. See Fox, 563 U.S. at 838.

Plaintiffs' proposed reduction of 10% also fails to account for the time they spent unsuccessfully pursuing a motion to amend concerning the legislative leaders. This time included time spent in proceedings both before the district court and in the court of appeals. Accordingly, the court subtracts time spent on (a) plaintiffs' unsuccessful racial gerrymandering claim, and (b) the unsuccessful motion practice concerning the inclusion of the legislative leaders as defendants. The court concludes that a reasonable estimate of time spent on these issues calls for an additional reduction of 20%, bringing the revised fee total to $417,244.88. See Fox, 563 U.S. at 838.[3]

2.

After subtracting the fees attributable to the unsuccessful racial gerrymandering claim and the unsuccessful motion practice concerning the inclusion of the legislative leaders, the court reduces the remaining fees attributable to the one-person, one-vote claim because plaintiffs did not obtain the complete success that they sought on that claim. See Hensley, 461 U.S. at 436; O'Fay, 2010 U.S. Dist. LEXIS 80128, at *6. As discussed, plaintiffs' submissions to this court and the Fourth Circuit

---

[3] A reduction of 20% from the lodestar total of $521,556.10, which already accounts for plaintiffs' own 10% reduction.

demonstrate that they obtained relief far more narrow than they desired. Thus, the court reduces the fee award attributable to the one-person, one-vote claim to reflect that plaintiffs failed to achieve all the relief they sought. The court concludes that a further reduction of 10% is reasonable and necessary to reflect plaintiffs' more-limited success, bringing the revised fee total to $375,520.39. See Fox, 563 U.S. at 838.

## C.

In sum, after adjusting the claimed hourly rate to accord with the rate typically charged for like work in the locality, reducing the hours expended to disallow time spent on redundant, excessive, or unnecessary work, applying the relevant Johnson/Barber factors, subtracting time spent on plaintiffs' unsuccessful claim and motion practice, and reducing the remaining fees in light of plaintiffs' more-limited success, the court awards plaintiffs attorneys' fees in the amount of $375,520.39.

## III.

Plaintiffs request $14,960.24 in non-taxable litigation expenses. Plaintiffs may recover litigation expenses under section 1988 if the expenses are "reasonable." See Trimper v. City of Norfolk, 58 F.3d 68, 75 (4th Cir. 1995); Daly, 790 F.2d at 1083. A prevailing party is not entitled to reimbursement for "questionable litigation expenses." Jones v. Dancel, 792 F.3d 395, 404 (4th Cir. 2015). Moreover, "[a]s with attorney's fees, the [c]ourt may also consider the degree of success in awarding litigation expenses under fee-shifting statutes" and reduce the expenses accordingly. Pierce v. Cty. of Orange, 905 F. Supp. 2d 1017, 1048 (C.D. Cal. 2012); see Wa. All. of Tech. Workers v. U.S. Dep't of Homeland Sec., 202 F. Supp. 3d 20, 27–29 & n.5 (D.D.C. 2016), aff'd, 857 F.3d 907 (D.C. Cir. 2017); Betancourt v. Giuliani, 325 F. Supp. 2d 330, 335 (S.D.N.Y. 2004); Rural Water Sys. No. 1 v. City of Sioux Ctr., 38 F. Supp. 2d 1057, 1067–68 (N.D. Iowa 1999), aff'd, 202

16

F.3d 1035 (8th Cir. 2000).

Plaintiffs seek reimbursements for, among other things, refreshments, maid service, valet gratuity, and food for the entire trial team both before and during trial. [D.E. 119-2] 5–7. The request is unreasonable and is denied. See Jones, 792 F.3d at 404. The court has reviewed the supporting documentation and concludes that a reduction of $615 accounts for these expenses. As it did with attorneys' fees, the court further reduces the amount claimed by 40% to reflect plaintiffs' limited success (30% for not succeeding on their racial gerrymandering claim and motion practice to add the legislative leaders, and 10% for the more-narrow relief ultimately obtained). Thus, the court awards expenses in the amount of $8,607.14.

IV.

Plaintiffs also seek an award of expert fees totaling $32,813.42 under 52 U.S.C. § 10310(e). Section 10310(e) provides that "[i]n any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party, other than the United States, . . . reasonable expert fees." 52 U.S.C. § 10310(e). Plaintiffs claim $32,813.42 in expert fees for expert witnesses Anthony Fairfax and Dr. Jowei Chen. See [D.E. 119-1] ¶ 52. Of this total, plaintiffs attribute $5,400 to Mr. Fairfax and $27,413.42 to Dr. Chen. See id. ¶¶ 52–54; [D.E. 119-2] 8–22.

Plaintiffs' requested reimbursement for all expert fees is unreasonable. Plaintiffs were only partially successful and cannot recoup the full amount of their expenses where those expenses were not necessary to the outcome. See Daly, 790 F.2d at 1083–85. Thus, the court reduces the expert fees by 40% to reflect the partial success achieved by plaintiffs (30% for not succeeding on their racial gerrymandering claim and motion practice to add the legislative leaders, and 10% for the more-narrow relief ultimately obtained). See id.; Favors v. Cuomo, 39 F. Supp. 3d 276, 309

17

(E.D.N.Y. 2014) (collecting cases for the proposition that courts have discretion to reduce expert fees by the same percentage as attorneys' fees on the basis of more-limited success). Thus, the court reduces the expert fees to $19,688.05.

The court further reduces the fees due to unreasonableness. See Favors, 39 F. Supp. 3d at 310. As in Favors v. Cuomo, 39 F. Supp. 3d 276 (E.D.N.Y. 2014), the court declines to award the full amount of expert fees requested because the experts' time records tracked time in one-hour increments with only vague descriptions of the work done. See id. at 309–12. Plaintiffs submitted invoices that fail to provide specific information concerning how Dr. Chen and Mr. Fairfax spent their time. Plaintiffs "have not supported their request with contemporaneous time records, thereby preventing this [c]ourt from determining the reasonableness of the claimed hours." Id. at 312. For example, plaintiffs state that Mr. Fairfax "expended in excess of 11 hours at an hourly rate of $185," [D.E. 120] 22, yet the only documentation submitted is Mr. Fairfax's retainer agreement and a bill for his attendance at trial. Moreover, neither Dr. Chen nor Mr. Fairfax provide any breakdown for the bills submitted to plaintiffs. [D.E. 119-2] at 9 (billing for "40 Hours" worked by Dr. Chen), 10 (billing flat daily rates for "On-location services" before and during trial by Dr. Chen), 19–22 (reflecting flat daily rates for report preparation and travel of Mr. Fairfax). These vague entries lack details of the experts' specific contributions. Thus, the court reduces the expert fees by an additional 10%. See Favors, 39 F. Supp 3d at 310–11. Accordingly, the total amount of recoverable expert fees is $17,719.24.

V.

Finally, plaintiffs claim taxable costs under Federal Rule of Civil Procedure 54(d), Local Civil Rule 54.1, and 28 U.S.C. § 1920 in the amount of $9,057.68. See [D.E. 118]. Federal Rule of Civil Procedure 54(d)(1) governs a post-judgment motion for an award of costs. See Fed. R. Civ.

18

P. 54(d)(1). Rule 54(d)(1) provides that "costs—other than attorney's fees—should be allowed to the prevailing party." Id. A "prevailing party" is "a party in whose favor a judgment is rendered" or "one who has been awarded some relief by the court." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 603 (2001) (quotation and alteration omitted). "[T]he rule gives rise to a presumption in favor of an award of costs to the prevailing party." Teague v. Bakker, 35 F.3d 978, 996 (4th Cir. 1994); see Delta Air Lines, Inc. v. August, 450 U.S. 346, 352 (1981). However, a district court has discretion to award or deny costs to the prevailing party. See Marx v. Gen. Revenue Corp., 568 U.S. 371, 377 (2013); Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441–42 (1987), superseded on other grounds by statute, 42 U.S.C. § 1988. A court "must justify its decision to deny costs by articulating some good reason for doing so." Cherry v. Champion Int'l Corp., 186 F.3d 442, 446 (4th Cir. 1999) (quotation, alteration, and citations omitted); see Teague, 35 F.3d at 996. One reason for denying or reducing an award of costs arises when "the prevailing party has been only partially successful." Barber v. T.D. Williamson, Inc., 254 F.3d 1223, 1234 (10th Cir. 2001); see Pierce, 905 F. Supp. 2d at 1049 ("[L]ike non-taxable litigation expenses, the [c]ourt may reduce an award of taxable costs to reflect only partial success.").

When an award of costs to the prevailing party is appropriate, the court looks to federal law to determine the scope of the award. See Crawford Fitting, 482 U.S. at 441–43. Section 1920 of Title 28 of the United States Code lists taxable costs. 28 U.S.C. § 1920; see Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 565 (2012) ("[Section] 1920 defines the term 'costs' as used in Rule 54(d)." (quoting Crawford Fitting, 482 U.S. at 441)).[4] Section 1920's list of recoverable costs is

---

[4] Taxable costs under section 1920 include:

(1) Fees of the clerk and marshal;

19

exhaustive as to "expenses that a federal court may tax under the discretionary authority found in Rule 54(d)." Crawford Fitting, 482 U.S. at 441–42. Accordingly, "Rule 54(d) does not provide authority to tax as costs those expenses not enumerated in [section] 1920." Herold v. Hajoca Corp., 864 F.2d 317, 323 (4th Cir. 1988); see Crawford Fitting, 482 U.S. at 441–42. This court's Local Civil Rule 54.1 "further refines the scope of recoverable costs." Silicon Knights, Inc. v. Epic Games, Inc., 917 F. Supp. 2d 503, 510–11 (E.D.N.C. 2012), aff'd, 551 F. App'x 646 (4th Cir. 2014) (per curiam) (unpublished).[5]

---

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 . . . ;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services . . . ."

28 U.S.C. § 1920.

[5] Local Civil Rule 54.1(c) provides a non-exhaustive list of normally recoverable costs:

(a) those items specifically listed on the bill of costs form. The costs incident to the taking of depositions (when allowable as necessarily obtained for use in the litigation) normally include only the reporter's fee and charge for the original transcript of the deposition;

(b) premiums on required bonds;

(c) actual mileage, subsistence, and attendance allowances for necessary witnesses at actual costs, but not to exceed the applicable statutory rates, whether they reside in or out of the district;

(d) one copy of the trial transcript for each party represented by counsel.

20

Plaintiffs' motion for costs obfuscates what costs plaintiffs seek to recover. The court-provided form for bill of costs reflects a total of $9,057.68 sought [D.E. 118], as does the supporting declaration. [D.E. 118-1] ¶ 3. But that same declaration includes a chart "summariz[ing] Plaintiffs' taxable costs," and those costs total $12,923.67. Id. ¶ 5. Rather than disavow some of these costs to reach the amount claimed on the bill of costs, the declaration justifies why plaintiffs can recover the total costs listed in the chart. See id. ¶ 7; see also [D.E. 118-2]. Faced with this discrepancy, the court determines plaintiffs' entitlement to costs with reference to the $9,057.68 claimed on the court-provided form.

Defendant does not argue that plaintiffs' claimed taxable costs are not recoverable under the governing standards. Instead, defendant asks the court to reduce the costs to the same extent the court reduces the award of attorneys' fees. The court agrees with this approach. See Barber, 254 F.3d at 1234; Pierce, 905 F. Supp. 2d at 1049. The court reduces these costs by 40% to reflect plaintiffs' limited success (30% for not succeeding on their racial gerrymandering claim and motion practice to add the legislative leaders, and 10% for the more-narrow relief ultimately obtained). Thus, the court awards plaintiffs $5,434.60 in taxable costs under Federal Rule of Civil Procedure 54(d).

_____

Local Civil Rule 54.1(c)(1). Local Civil Rule 54.1(c) also identifies items "normally not taxed, without limitation" as

(a) witness fees, subsistence, and mileage for individual parties, real parties in interest, parties suing in representative capacities, and the officers and directors of corporate parties;

(b) multiple copies of depositions;

(c) daily copy of trial transcripts, unless prior court approval has been obtained.

Local Civil Rule 54.1(c)(2).

21

VI.

In sum, plaintiffs' motion for attorneys' fees, expert fees, and litigation expenses [D.E. 119]

and motion for costs [D.E. 118] are GRANTED IN PART and DENIED IN PART. It is ORDERED

that:

1.    Plaintiffs shall recover from defendant attorneys' fees in the amount of
      $375,520.39;

2.    Plaintiffs shall recover from defendant litigation expenses in the amount of
      $8,607.14;

3.    Plaintiffs shall recover from defendant expert fees in the amount of
      $17,719.24;

4.    Plaintiffs shall recover taxable costs from defendant in the amount of
      $5,434.60; and

5.    The Clerk is DIRECTED to enter judgment in both actions consistent with
      this order and to note that motions [D.E. 125] and [D.E. 126] in Case No.
      5:13-CV-607-D are RESOLVED in this order.

SO ORDERED. This 29 day of September 2017.


                                        JAMES C. DEVER III
                                        Chief United States District Judge